1                    **UNITED STATES DISTRICT COURT**

2                 **EASTERN DISTRICT OF NORTH CAROLINA**

3

**UNITED STATES OF AMERICA,**        )

4                                     )

             **Plaintiff,**           )      **DOCKET NO. 5:20-cr-00305-M-1**

5                                     )

      **VS.**                         )

6                                     )

**CHARLES ANTHONY PITTMAN,**          )

7                                     )

             **Defendant.**           )

8                                     )

_____)

9

          **TRANSCRIPT OF PRELIMINARY AND DETENTION HEARINGS**

10           **BEFORE THE HONORABLE ROBERT T. NUMBERS, II**

               **TUESDAY, JUNE 16, 2020; 10:42 A.M.**

11                    **RALEIGH, NORTH CAROLINA**

12   **FOR THE PLAINTIFF:**

          United States Attorney's Office

13        By:  J. D. Koesters, AUSA

          150 Fayetteville Street, Suite 2100

14        Raleigh, North Carolina  27601

15   **FOR THE DEFENDANT:**

          Office of Federal Public Defender

16        By:  Joseph L. Ross, II, AFPD

          150 Fayetteville St., Suite 450

17        Raleigh, North Carolina  27601

18

19   Audio Operator:              COURT PERSONNEL

20

          Proceedings recorded by electronic sound recording,

21   transcript produced by transcription service.

22                    **JANICE RUSSELL TRANSCRIPTS**

                        **1418 Red Fox Circle**

23                      **Severance, CO  80550**

                         **(757) 422-9089**

24                   **trussell31@tdsmail.com**

25

1                           I N D E X

2                                                        Page

3
Government's
4    Witnesses:              Direct   Cross      Redirect

5    Jeff Silver                5      14        16

6

7    EXHIBITS:                         Marked    Received

8       US-1&2    Photographs          11        11

9       US-3&4    Photographs          12        13

10

11
ARGUMENT:       Mr. Koesters                    19
12
                Mr. Ross                        23
13

14   THE COURT:    Finding                       28

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2              THE COURT:  All right.  The next matter on the Court's

3   docket is United States of America versus Charles Pittman, Case

4   No. 5:20-mj-1575.

5              We're here today for Mr. Pittman's detention and

6   preliminary hearings.  It's my practice in those cases to

7   conduct both hearings at the same time unless there's an

8   objection from counsel.

9              Any objection from the Government?

10             MR. KOESTERS:  No, your Honor.

11             THE COURT:  Any objection from the defense?

12             MR. ROSS:  No, sir.

13             THE COURT:  All right.

14             And for the record I am United States Magistrate Judge

15  Robert Numbers.

16             I'd like counsel to identify themselves for the

17  record, beginning with counsel for the United States.

18             MR. KOESTERS:  Yes, your Honor.  J. D. Koesters for

19  the United States.

20             THE COURT:  Good morning.

21             MR. ROSS:  Good morning, your Honor.  Joseph Ross, II

22  on behalf of Mr. Pittman.

23             THE COURT:  All right.  Good morning, Mr. Ross.

24             Now Mr. Pittman is not present in the courtroom.  He's

25  appearing by videoconference due to the steps the Court is

1  taking to limit the spread of the COVID-19 virus.  However, we

2  may only proceed in that manner if Mr. Pittman agrees to do so

3  after having spoken with his attorney.

4          Mr. Ross, have you spoken with Mr. Pittman and does he

5  agree to proceed by videoconference?

6          MR. ROSS:  I have and he does.

7          THE COURT:  All right.

8          Is that correct, Mr. Pittman?

9          THE DEFENDANT:  Yes, your Honor.  That's correct, sir.

10         THE COURT:  All right.  And Mr. Pittman, if at any

11  point during today's proceedings you lose the ability to hear

12  or see us, please do your best to let us know and we'll pause

13  to address whatever the issue is, all right?

14         THE DEFENDANT:  Yes, sir, your Honor.  Thank you so

15  much.

16         THE COURT:  All right.  And I'd also let you know that

17  we can hear anything you say there in the courtroom, or in the,

18  in the lockup.  So I would recommend not saying anything that

19  you would not want the United States Attorney to hear, all

20  right?

21         THE DEFENDANT:  Yes, sir, your Honor.

22         THE COURT:  All right.  And if you, if you'd like to

23  speak with your attorney at any point in time, let us know and

24  we'll make the necessary arrangements, okay?

25         THE DEFENDANT:  Yes, sir.

 1              THE COURT:  Great.

 2              All right.  The Government bears the burden on the

 3     issue of probable cause.  So I'll ask the Government to proceed

 4     first today.

 5              MR. KOESTERS:  Yes, your Honor.

 6              The Government calls Special Agent Jeff Silver.

 7              JEFF SILVER, GOVERNMENT'S WITNESS, SWORN

 8              THE COURTROOM DEPUTY:  Thank you.  So have a seat and

 9     state your name for the record, please.

10              THE WITNESS:  My name is Jeff, J-E-F-F; Silver,

11     spelled just like the color.

12              THE COURTROOM DEPUTY:  Thank you.

13                          DIRECT EXAMINATION

14     BY MR. KOESTERS:

15     Q    Special Agent Silver, where do you work?

16     A    I work for the Bureau of Alcohol, Tobacco, Firearms, and

17     Explosives in Fayetteville --

18     Q    And what --

19     A    -- North Carolina.

20     Q    What do you do for ATF?

21     A    I'm a special agent.  I'm responsible for enforcing federal

22     firearms violations, narcotic violations, in this case statutes

23     violating the arson statute.

24     Q    Do you have any history or experience with fires and

25     arson --

1   A    I do.

2   Q    -- crimes?

3        How so?

4   A    I've been with ATF for seven years, but prior to ATF for 18

5   years I was a firefighter.

6   Q    Okay.

7   A    Served in various leadership positions and stuff like that.

8   Q    All right.

9        In the execution of your duties as a special agent with

10  ATF, have you become familiar with the circumstances

11  surrounding the, the criminal complaint that is at hand with

12  Mr. Pittman?

13  A    Yes, I have.

14  Q    Can you explain to the Judge what happened?

15  A    Sure.

16       On March -- sorry -- May 30, 2020 protests took place in

17  downtown Fayetteville, North Carolina.  At approximately 7:15

18  p.m. the, the previously peaceful protest turned violent as

19  multiple individuals, both known and unknown, set fire to a

20  federal historic landmark known as the Market House.  Market

21  House is located at 1 Market Square in Fayetteville.  It was

22  built in 1832 and was entered into the National Register of

23  Historic Places on September 15, 1970.

24       An individual taking part in setting the Market House on

25  fire was later identified as Mr. Charles Anthony Pittman.

1  Various local media had covered the protest and filmed

2  Mr. Pittman standing on the second story balcony of the Market

3  House holding a red plastic gasoline container.  Mr. Pittman

4  wore a black T-shirt with a black-and-white photo of Martin

5  Luther King, Jr. addressing a crowd on the National Mall.

6  Mr. Pittman also wore white earbuds which were dangling from

7  one ear down his chest and partially tucked into the neckline

8  of his shirt.

9      Mr. Pittman spread gasoline throughout the second floor of

10  the Market House.  An employee who was at the Market House

11  because of the burglar alarm had gone off after protestors had

12  forced entry into the building witnessed several individuals on

13  the second floor breaking out windows and breaking furniture

14  inside.  One of the individuals, who the employee later

15  identified as Mr. Pittman, went to an open window to show the

16  crowd the red gasoline container in his hands.  The employee

17  watched as Mr. Pittman began to douse the floor of the second

18  story with gasoline.  The employee's attention turned to the

19  other individuals inside.  When the employee turned back to

20  Mr. Pittman he noticed Mr. Pittman standing next to a fire

21  right where Mr. Pitt, where he had observed Mr. Pittman pour

22  the gasoline.

23      The next day, ATF responded to the scene and I was

24  contacted by the Fayetteville Police Department Crime

25  Information Center.  A crime analyst reached out to me and said

1  that she was able to locate or identify Mr. Pittman and found a

2  video on his Facebook profile.  The video was recorded earlier

3  in the day on May 30th.  It appeared to be Mr. Pittman driving

4  a vehicle through downtown Fayetteville.  In that video

5  Mr. Pittman also wore the same black T-shirt with the black-

6  and-white photo of Martin Luther King, Jr. as well as the white

7  earbuds.

8      In the video Mr. Pittman discussed the Market House.  He

9  started with saying, "I'm out here doing the scopee scopee.

10  I'm out here doing the scope, scoping out the scene."  As

11  Pittman pulled up to the traffic circle with the Market House

12  in the middle, he said, "It looks like it's there for the

13  taking."  As he passed by a Fayetteville Police Department

14  marked patrol car, he -- he -- Mr. Pittman said, "They know

15  it's coming.  They are waiting."  After discussing whether

16  slaves were sold at the Market House, Mr. Pittman declared,

17  "Maybe it should come down."  As Pittman pulled away from the

18  Market House, he told Facebook Live Crowd, "We'll be back.

19  We'll be back.  I'll be back, y'all, 100."

20      In the video the steering wheel of Mr. Pittman's car

21  appeared to hold a Mercedes Benz logo.  I was able to query

22  North Carolina Department of Motor Vehicles and find that

23  Mr. Pittman had a 2001 Mercedes Benz E320.

24      The Market House did sustain damage as a result of the

25  fires on May 30th.  Damage includes charring discoloration on

1  the exterior stairway and supportive railing; charring and

2  discoloration on the wooden stairs and supportive railing;

3  charring and discoloration to the wooden safety rail located on

4  the exterior second floor balcony; discoloration and soot on

5  the interior walls around the entrance doorway and wood stairs

6  that access the second floor; and charring and mass loss to the

7  wood flooring on the second floor.

8      I reached out to the Fayetteville Police Department to

9  determine if the City of Fayetteville does, indeed, receive

10  federal funding.  I received an e-mail response from Capt.

11  Robert Spatorico from the Fayetteville Police Department and he

12  told me they do.

13  Q    So going back a little bit, so the employee who was --

14  spoke -- who spoke to authorities and identified Mr. Pittman,

15  was he in the building when it actually caught fire?

16  A    He responded to the building 'cause the burglar alarm went

17  off.  He was the point of contact.  When he got there he

18  noticed there was rooting, rioting going on, some looting, and

19  he went inside the building and there were several people

20  inside.

21  Q    Okay.  When he identified Mr. Pittman, how was he

22  identified?  Can you explain that process?

23  A    He was shown a picture of just Mr. Pittman not holding a

24  gas can and he identified him as the gentleman who went from

25  the balcony and then was looking out the second floor window to

1  the crowd down below.

2  Q   Okay.

3       In terms of the news outlets and the media outlets and the

4  Facebook Live video, have you seen those images that were

5  posted, both on Mr. Pittman's Facebook profile as well as on

6  the WRAL and other news?

7  A   I have.

8  Q   Okay.

9           MR. KOESTERS:  Your Honor, may I approach?

10          THE COURT:  You may.

11          MR. KOESTERS:  I'm handing him two pictures.

12      (Counsel hands pictures to the witness)

13  BY MR. KOESTERS:

14  Q   Agent Silver, do you recognize those photos?

15  A   I do.

16  Q   What are they?

17  A   The one is a, like a screenshot of when Mr. Pittman was

18  doing the, the video that he shot on Facebook and then the

19  second one is of Mr. Pittman standing looking over the, the

20  balcony from the second floor of the Market House.

21  Q   When he was holding the red gas can?

22  A   Right.

23  Q   Okay.

24          MR. KOESTERS:  Your Honor, we'd ask that the Court

25  consider these pictures as part of the Government's evidence.

1          THE COURT:  Any objection?

2          MR. ROSS:  No objection.

3          THE COURT:  So admitted.

4     (U. S. Exhibits 1 and 2 admitted in evidence)

5  BY MR. KOESTERS:

6  Q   In that Facebook Live video was Mr. Pittman driving that

7  veh, the Mercedes Benz?

8  A   Yes, he was.

9  Q   Okay.  And you've == so you've gone to Mr. Pittman's

10 Facebook photos, Facebook page?

11 A   Yes.

12 Q   Is, are there privacy settings on it?

13 A   It's open.

14 Q   Okay.  Have you seen any other postings that are relevant

15 to the fire or his intent when it comes to the fire?

16 A   He had various postings on there.  He had one posting of a

17 building that was burning and a, like a Bible-type quote, verse

18 quoted.

19          MR. KOESTERS:  Your Honor, may I approach again?

20          THE COURT:  You may.

21     (Pause)

22     (Counsel hands pictures to the witness)

23 BY MR. KOESTERS:

24 Q   Special Agent Silver, do you recognize those two photos?

25 A   I do.

1  Q    What are those photos of?

2  A    The first one was dated May 28th.  It was, it was almost

3  like a repost from somebody who had posted something.  The

4  original post was May 28th at 7:47 a.m. by somebody by the,

5  that goes by the name of Michael Robinson and it said, "This

6  ain't justice, man."  And it's a, a picture of a burning

7  building.

8       And then Mr. Pittman posts at 1:24 p.m., same day, "Well,"

9  and then he quotes Luke 12:49 KJV, "I am come to send fire on

10 the earth; and what will I, if it be already kindled?"

11 Q    Okay.

12 A    And then the second is from May 31st at 12:25 p.m.  It

13 says, "If you hating on looters, protesters, etc., I know you

14 ain't got a drip drop of Gangsta Soldier revolutionary in you

15 nor intelligence 'cause you would at least understand."

16 Q    And those are posts from Mr. Pittman's Facebook profile?

17 A    Correct.

18 Q    And you confirmed through, through photos and other

19 identifiers that, that is, in fact, his Facebook profile?

20 A    Yes.

21      MR. KOESTERS:  Your Honor, we'd ask that you, the

22 Court consider these two photos as well as evidence.

23      THE COURT:  Any objection?

24      MR. ROSS:  None.

25      THE COURT:  So admitted.

1      (Exhibits 3 and 4 admitted in evidence)

2   BY MR. KOESTERS:

3   Q   And finally, I'd like to talk to you briefly about the

4   arrest of Mr. Pittman.

5      Were you there at the arrest of Mr. Pittman?

6   A   I was.

7   Q   Can you explain to the Judge what happened on the day of

8   his arrest?

9   A   We identified that his vehicle was sitting at the

10  WoodSprings Suites, which is a extended type stay hotel in

11  Fayetteville.  He had pulled out of the parking spot that he

12  was parked in.  So we -- I, I was using the Fayetteville Police

13  Department to assist me with his apprehension and they try not

14  to conduct vehicle stops in case the vehicle, vehicle attempts

15  to flee.

16     So we surveilled Mr. Pittman drive pretty much around the

17  whole City of Fayetteville and then he ended up back at the

18  WoodSprings Suites, which is, when he pulled into the parking

19  spot, is when we conducted a traffic stop from multiple angles

20  to ensure he was apprehended.

21  Q   All right.  So he, he was actually driving around during

22  the day throughout Fayetteville --

23  A   Yes.

24  Q   -- on the day of his arrest?

25  A   Yes.

1   Q    Okay.  And he was staying at that hotel?

2   A    Yes.

3   Q    Okay.  Thank you.

4            MR. KOESTERS:  No further questions, your Honor.

5            THE COURT:  Cross-examination?

6                         CROSS-EXAMINATION

7   BY MR. ROSS:

8   Q    The Market House, that's that building that's kind of in

9   the circle in Fayetteville?

10  A    Correct.

11  Q    Where slaves were sold?

12           MR. KOESTERS:  Objection, your Honor.  Relevance to

13  this.

14           THE COURT:  Sustained.

15  BY MR. ROSS:

16  Q    So what is this building?

17  A    I know the square and the building itself to be a historic

18  monument and that's all I really know about it.

19  Q    Can you tell me of -- who was the person you spoke to from

20  Fayetteville about the funding that they received from the

21  Government?

22  A    Right.  Captain Robert Spatorico from the Fayetteville

23  Police Department.

24  Q    How much money did Fayetteville receive from the

25  Government?

 1  A    In fiscal year 2019-2020 it was in excess of $31 million.

 2  Q    And how much of that in that $31 million was earmarked for

 3  the Market House?

 4  A    I'm not sure.

 5  Q    Well, can you tell us it was a dollar?

 6  A    I can't tell you anything about it 'cause I don't know.

 7  Q    So you can't tell us if any funds actually went to the

 8  Market House, can you?

 9  A    No, but it went to the City of Fayetteville.

10  Q    Okay.  The Market House is not being leased to the Federal

11  Government, is that correct?

12  A    Excuse me?

13  Q    The Market House is not being leased to the Federal

14  Government, is that correct?

15  A    Not, not to my knowledge.

16  Q    It's not being leased to a department agency of the, the

17  Federal Government, is it?

18  A    Not that I know of.

19  Q    And did you find anything to show that the Market House was

20  given earmarks by Congress for financial assistance?

21  A    No.

22  Q    No.  And even though I asked you if it was leased by the

23  Federal Government, it's definitely not owned by the Federal

24  Government, is that correct?

25  A    Correct.

1  Q    Thank you.

2           MR. ROSS:  Nothing further.

3           THE COURT:  Any redirect?

4           MR. KOESTERS:  Briefly, your Honor.

5                        REDIRECT EXAMINATION

6  BY MR. KOESTERS:

7  Q    So the Market House, you said there are employees who are

8  responsible for maintaining the security of it?

9  A    They have, from what I understand, a staff of like three

10 people that float between a couple of the historic places in

11 the City of Fayetteville.

12 Q    Okay.  And who, who employs those individuals?

13 A    The City of Fayetteville.

14 Q    Okay.  And in terms of its maintenance, its care, cleaning

15 of the area around it, who's responsible for that?

16 A    I believe the City of Fayetteville is, yeah.

17 Q    Okay.  And do the employees of the City of Fayetteville do,

18 do that work?

19 A    I'm assuming so.

20 Q    Okay.

21           MR. KOESTERS:  No further questions, your Honor.

22                        RECROSS EXAMINATION

23 BY MR. ROSS:

24 Q    I, I just want to make sure.  All those people that you

25 just talked about, can you earmark any of the money which they

1  are paid it's from the Federal Government?

2  A    I have no idea how the City of Fayetteville divvies their

3  money up.

4  Q    Thank you.

5           MR. ROSS:  Nothing further.

6           THE COURT:  Thank you, sir.  You may step down.

7           Anything further from the Government?

8           MR. KOESTERS:  No, your Honor.  Not at this time.

9           THE COURT:  Anything from the defense today?

10          MR. ROSS:  Yeah.  I, I'm just going to present by

11 proffer --

12          THE COURT:  All right.

13          MR. ROSS:  -- a third-party custodian.

14          I present to the Court Wanda Anderson, who lives at

15 731 Commerce Street in Fayetteville, North Carolina.  She is --

16          Will you please stand?

17    (Ms. Anderson complies)

18          THE COURT:  She is present.

19          You may have a seat.

20          She is the mother of Mr. Pittman.  She has -- and he

21 has lived here most of his life other than the times that he's

22 been in the military or has worked.  She is willing to allow

23 him to stay at her house, even though he is married, during the

24 outcome of this case.  She is willing to make sure he shows up

25 for court, which is a big ask considering his background.  She

 1   is also willing to allow electronic monitoring in the household

 2   as well.  She will ensure that he continues to work if the

 3   Court allows and she will make sure that he is able to meet

 4   with his attorney, which would be me.

 5           With that, that's the evidence on which we show.

 6           She has no guns.  She has no drugs.  She's not going

 7   to let, let anything illegal in her house.

 8           Thank you.

 9           THE COURT:  Thank you.

10           MR. KOESTERS:  Your Honor, I do have a few questions

11   for Ms. Anderson regarding conditions in which they are living.

12           Mr. Pittman claims that he had been living in --

13   sorry.

14           THE COURT:  That's all right.

15           MR. KOESTERS:  Claims that he, he had been living

16   there prior to this, but the officers and intelligence from the

17   officers have said that he was actually living in a hotel.

18           So I'm just trying to get some clarification on where

19   he's been during this time.

20           MR. ROSS:  Your Honor, that's not relevant to her

21   being a third-party custodian.  She is willing to be a third-

22   party custodian at this point.  I think, more or less, they're

23   just doing fishing for their purposes of preparing their case.

24           MR. KOESTERS:  Your Honor, at this point if -- if --

25   if you'd not like us to put it on, we can just proffer the fact

1  that, that the officers and the special agents from ATF were

2  able to identify that despite Mr. Pittman's assertions in the

3  PSR that he had been living with his mother at this residence,

4  he, in fact, had been living in a hotel.

5          THE COURT:  I'll note that.  Thank you.

6          MR. KOESTERS:  Thank you, your Honor.

7          THE COURT:  All right.  Is there argument from the

8  Government?

9          MR. KOESTERS:  Your Honor, in terms of the probable

10  cause under 18 U.S.C. -- sorry.  I apologize -- 844(f)(1), in

11  this there, there must be that the defendant maliciously

12  damaged -- and I apologize.  I'm standing up again.

13          THE COURT:  That's all right.  It's a hard habit to

14  get out of.

15          MR. KOESTERS:  Poor habit.

16          -- that he damaged or destroyed a building by fire,

17  explosive, that that building was owned, possessed, or, and

18  otherwise run by a entity or organization that is receiving

19  federal funding.  How that organization disburses, there,

20  there's pretty significant case law on this saying, you know,

21  how they disburse those funds and the amount of actually

22  earmarking those funds toward the maintenance and care of that

23  building is not relevant.  It is more of whether that

24  organization is receiving funding that is then they are given

25  the autonomy to be able to distribute the funds as they see.

1          In this, in this instance, your Honor, Fayet, City of

2    Fayetteville employs all of the individuals who maintain the

3    Market House.  They were able to receive -- they -- Special

4    Agent Silver was able to confirm the funding.  They were also

5    able to confirm the employees who maintain that area or, and

6    watch over that and maintain the security of it are employed by

7    the City of Fayetteville.  We believe there is significant

8    probable cause to say that this is, clearly, 844(f)(1) and

9    (f)(2) and (2) have been violated in this instance.

10          In terms of the detention, looking at 18 U.S.C. 3142,

11   first, the nature and circumstances of the offense.  This was

12   clearly a premeditated plan on the part of Mr. Pittman.  On May

13   28th he is justifying actions of setting a building on fire

14   when people are posting that, "This is not justice."  No doubt

15   emotions were high during this time, but he is clearly

16   signaling what he believes is potentially right and what is

17   potentially going to come.  And then just two days later, on

18   May 30th, before the protest had begun, the peaceful protest,

19   Mr. Pittman is driving around and, and we were actually able to

20   confirm with Probation that during this time Mr. Pittman is

21   driving around while his license is revoked.

22          So he is driving through the City of Fayetteville and

23   saying that he is out there to "scope the scene."  And now when

24   he sees the Market House he says, "It's there for the taking."

25   He sees a Fayetteville police officer's car there and he says,

1   "They're ready for it.  They know we're coming," and then he

2   discusses whether, that he's going to take it down, whether it

3   "should come down."  He clearly was premeditating that.

4           And then he, he went on to even mock the peaceful

5   protesters saying, "What are they going to do?  Mildew and

6   barbecue?"  He had the premeditated plan to go there with a

7   gasoline can and set it on fire, as the employee saw.  This

8   wasn't somebody who just kind of got caught in the group

9   thinker, emotions got the best of them as others were leading

10  the charge.  Mr. Pittman went there with a plan, a plan that he

11  openly and notoriously discussed seeking the attention of it,

12  putting it on a Facebook Live video.

13          When we look against the weight of the evidence, news

14  cameras were all over the place there picking up Mr. Pittman

15  walking in and out of it and even holding up that red gasoline

16  can that the employee later identified him with.  The -- as we

17  said, the employee sees his face and can say, "Hey, that's the

18  guy with the red gas can."  He didn't even have to see him with

19  a picture, red gas can.

20          And, and I think most importantly is, you know, when

21  we look at the evidence the defendant himself put him in, put

22  the most weight of evidence on himself when he's discussing his

23  plans.  He's justifying his actions through his Facebook post.

24          The history and characteristics of, of him, I think

25  what stands out here and what everyone has to take note of is

1  his record of court appearances.  He has, as I counted through

2  the PSR, six -- six -- a history of six different court

3  appearances in, two in Greenville, South Carolina, two in

4  Alabama, one in Georgia, and one in New Mexico.  Most of these

5  are stemming from driving while license is revoked and other

6  various traffic instances, but one also includes marijuana.

7  And then when you look in his PSR and he discussed his domestic

8  travel, he puts himself in each one of these states.  He was

9  there.

10        Those two things connect, you know.  One time if you

11  were out of state, you're traveling through a state and you're

12  pulled over and you're arrested for something and you miss your

13  court appearance, that might be a mistake.  Two times, it might

14  just be, you know, a lack of care or a bad coincidence.  Six

15  times is a pattern.  It's a pattern of somebody who does not

16  care and does not feel that they are accountable when they are

17  caught by the law.

18        And also, your Honor, to take note of the driving

19  while license revoked, another step that the State has taken to

20  put constrains [sic] on him that he just readily ignores, so

21  much so that he was ignoring it on the day of this incident and

22  then he was ignoring it again on the day of his arrest.

23        Now when you put all of these factors together,

24  ultimately what it shows is that Mr. Pittman just feels that he

25  does not have to account to him, to the law or to what this

1 Court will do and there's no reason to believe that he's going

2 to change. He clearly openly and notoriously sought the

3 attention and told everyone what he was going to do 'cause he

4 didn't feel like anything was going to hold him accountable

5 when he set a building on fire with people inside of it. That

6 type of mindset poses both a danger of a risk of flight, him

7 not failing to, him failing to appear, but also a danger to the

8 community when he feels justified in his actions of setting a

9 building on fire and putting people's lives in danger.

10         And for those reasons, your Honor, we'd ask that you

11 continue his detention.

12         THE COURT:  Thank you.

13         Mr. Ross?

14         MR. ROSS:  May I approach, your Honor?

15         THE COURT:  You may.

16     (Counsel hands document to the Court)

17         THE COURT:  Thank you.

18         MR. ROSS:  Your Honor, I'm going to deal with probable

19 cause.  I've just given you the statute.  I highlighted the

20 area where I cross-examined.  The Government has failed to meet

21 that, even at this stage.  And they don't need a, a lot.  They

22 need something.  They need something more than just saying the

23 City receives funds.  They can't show not even a penny that

24 actually goes to the Market House.  They can't show a penny

25 that goes to any of the three people that work there.  They

1  can't even show anything to show that there's a lease, a

2  payment at any point of time.  Judge, this is a state matter.

3  This is the Executive Branch overreach by any means necessary.

4          I grew up in Philadelphia, a city that has many

5  monuments, including the Liberty Bell, Independence Mall.

6  Independence Mall is obviously a federal entity.  Anything that

7  happens on there, I wouldn't be here talking about this, but

8  "Mr. Ross, you're talking about Philadelphia."  Liberty Bell,

9  either.  We leave here talking about whether it was a federal,

10  whether they can prove their case.

11          But I tell you how they could have proved this case,

12  if this was Fort Bragg, if this was even the sign on Fort

13  Bragg.  That's federal property.  That's property which the

14  Federal Government owns, not here.

15          If that's the matter, I don't care who lives in

16  Fayetteville, whether it's one of our investigators, whether

17  it's Special Agent Silver, or any, anybody else there.  Because

18  Fayetteville receives money?  Oh, no.  That's not enough in

19  this matter.  The Government has failed in their, such a small

20  burden at this point.  Now that's the probable cause.

21          THE COURT:  Well, let's -- I -- l -- let's focus on

22  that for a minute 'cause I think I, I think it's important and

23  I, I mean, it's an interesting argument 'cause it gets to the

24  text of the statute and it's a statute we don't deal with very

25  often, I guess fortunately.

1          I've got it in front of me on my screen and I've got

2     what you gave me, Mr. Ross.

3          MR. ROSS:  Yes, sir.

4          THE COURT:  I mean, it seems to say:

5               "Whoever maliciously damages or destroys, or attempts

6               to damage or destroy, by means of fire," which is what

7               we've got here, "any building, vehicle, or other

8               personal or real property in whole or in part owned or

9               possessed by, or leased to, the U. S., or any

10              department or agency thereof, or any institution or

11              organization receiving Federal financial assistance."

12         MR. ROSS:  Yes, sir.

13         THE COURT:  So what -- so it doesn't have to be owned

14    by the U. S.  It doesn't have to be the Liberty Bell and all

15    that stuff.  It can be property owned by an "institution or

16    organization receiving Federal financial assistance."

17         Why do you say they haven't met that portion of this

18    statute?

19         MR. ROSS:  They can't -- there's a couple reasons.

20         No. 1, you need to earmark a certain thing to show the

21    interstate nexus.  I mean, on guns it's easy.  No guns are made

22    in, in, in, in, in North Carolina.  No ammunition is made in

23    North Carolina.  They can't show -- nothing that shows that

24    federal money went to that particular building.  If that's the

25    case, everything in Fayetteville, everything in Fayetteville

 1    should come into federal court and I can't imagine that anybody

 2    intended that anything that happens in a city and a state

 3    should come into Federal Government.

 4         Look, the Government may go back and be able to get an

 5    indictment from a grand jury, which they might, but at this

 6    point, Judge, please don't, don't sign off on this.  The

 7    statute says what it says and you heard the special agent

 8    testify that he cannot tell this Court where any of those funds

 9    went directly to any of the people working there or to that

10    building.  This is a state matter.

11         MR. KOESTERS:  Your Honor?

12         THE COURT:  I'll, I'll hear from the Government on

13    this.

14         MR. KOESTERS:  The plain text of the statute does not

15    require any type of earmarking.  Any -- just a -- the basic

16    legal research on this -- and I apologize.  If, if we need to

17    take a ten-minute recess for us to bring some of the case law

18    to the Court's attention, we can do that -- but the courts have

19    interpreted that the exact same way.  This is truly the musings

20    of Mr. Ross at this point, attempting to add an additional

21    element into a statute, and it's just not there, especially

22    when we're looking at probable cause in this issue, your Honor.

23         The Government has absolutely met its burden.  The

24    clear language of the statute supports this.  Any type of legal

25    research into this issue also supports that.

1    THE COURT:  Well, on probable cause, I'm going to take

2    that portion of this under advisement and I'll go do my own

3    research and figure out what the right answer is on that point.

4    But Mr. Ross, you want to be heard on, on detention as

5    well?

6    MR. ROSS:  Your Honor, I'm going to ask that he be

7    released to the custody of his mother to live at that address.

8    If the Court so chooses, to be placed on electronic monitoring,

9    for him not to drive a car, and with all speed for him to take

10   care of these matters that he has open.

11   I do believe in most jurisdictions that the state

12   courts are closed at this time, but whatever needs to be done

13   our office will help him get in contact with the different

14   agencies and the different states where he has these open

15   traffic violations, that we will make sure that his case is no

16   longer being placed in warrant status.

17   That is what we would ask the Court to consider and

18   ask the Court to release him.

19   Thank you.

20   THE COURT:  All right. I'm going to take a brief

21   recess to consider this matter.  I will then issue a

22   conditional ruling on detention.  I'll go do the work that I

23   need to do on probable cause and, and issue an order on that.

24   So we'll be in a brief recess.

25   MR. ROSS:  Thank you.

1      COURT SECURITY OFFICER:  All rise.  Court will be in

2  recess.

3      (Recess from 11:16 a.m., until 11:26 a.m.)

4                      AFTER RECESS

5      (Call to Order of the Court)

6          THE COURT:  All right.

7          So I've considered the credible information we've

8  received here today, including the Pretrial Services report,

9  and make the following findings:

10          This does not appear to be a case in which the

11  rebuttable presumption in favor of detention would apply.  So I

12  will move to the Bail Reform Act factors, the nature and

13  circumstances of the offense the defendant is charged with, the

14  weight of the evidence against the defendant, his history and

15  characteristics, and the nature and seriousness of the risk

16  posed to the community by the defendant's release.

17          After considering those factors, the Court has

18  determined that if there's probable cause that support these

19  allegations, it is appropriate to detain the defendant pending

20  further proceedings.

21          Here, we have a situation where the defendant is

22  charged with a very serious and dangerous crime.  It, it

23  appears this is a very premeditated offense.  This was not one

24  that was a spur-of-the-moment, caught up by the passions of the

25  moment, or of the crowd.  This, from the Facebook Live video

1  and the defendant's presence at the Market House with a, a very

2  large, probably a five-gallon gas container, it shows that this

3  was something that was thought through well in advance and

4  the -- either the -- the potential dangerousness of that was

5  either disregarded or not considered by the defendant and it's,

6  it's a sad commentary on our society, but the issues that, you

7  know, preceded or underlie what brought the defendant to the

8  Market House that day do not seem to be going away anytime

9  soon.  It continues to be an issue our society is wrestling

10  with and thus, if he was so moved to engage in this type of

11  dangerous and premeditated activity, it's difficult for the

12  Court to believe that in the future he would not be so moved

13  again if we are so unfortunate as to have more instances like

14  those that have brought us here to this point in our nation's

15  history.

16       Additionally, the defendant does have numerous

17  failures to appear.  It appears to be an ongoing issue with the

18  defendant, that he's failed to appear at criminal proceedings.

19  In this case, he's facing much more serious penalties than he's

20  ever faced in the past.  He's facing a mandatory minimum of

21  five years on the 844(f)(1) charge and a mandatory minimum of

22  seven years on the 844(f)(2) charge.  And so it provides the

23  defendant with a substantial incentive to flee and his record

24  indicates that he has no issues doing so.

25       In light of all of this, I don't believe that the

1  third-party custodian that's been presented is going to be

2  sufficient to assure the defendant's appearance and the safety

3  of any other person and the community pending the outcome of

4  the case.  It appears by the defendant's own admission that he

5  was living with the proposed third-party custodian at the time

6  he engaged in the conduct that's at issue here.  And so that,

7  obviously, didn't deter him before.  I don't see why it would

8  deter him in the future from doing so.

9       So based upon all those factors, I'm going to find the

10  Government has shown by a preponderance of the evidence that

11  there are no conditions I could impose that would reasonably

12  assure his appearance at future proceedings and that it's shown

13  by clear and convincing evidence that there are no conditions I

14  can impose that would reasonably assure the safety of any

15  person and the community pending the outcome of the case and,

16  therefore, the motion for detention's granted, obviously

17  conditional on my ruling on probable cause.  If I find probable

18  cause, the defendant will be, remain in custody.  If I find

19  that there's no probable cause, the charges will be dismissed

20  and the defendant would be released from custody.

21       Anything further from the Government?

22       MR. KOESTERS:  No, your Honor.

23       THE COURT:  Anything further from defense?

24       MR. ROSS:  Your Honor, just, just for sake of trying

25  to figure out everything, do you think it'll be sometime this

1   week you'll make a decision or --

2           THE COURT:  Yes.  I mean, I would hope to do it today.

3           MR. ROSS:  Okay.

4           THE COURT:  If not today, then, then I think -- I

5   don't have anything on my docket tomorrow.  So I would

6   definitely assume by the end of the day today, tomorrow I'll

7   get it done.

8           MR. ROSS:  All right.

9           THE COURT:  So.  All right.

10          All right.

11          MR. ROSS:  Thank you.

12          THE COURT:  Anything further?

13          MR. KOESTERS:  No thank you.

14          THE COURT:  All right.  That concludes the proceedings

15  for the defendant.  He's remanded to the custody of the

16  Marshals.

17          And we'll be in recess.

18          COURT SECURITY OFFICER:  All rise.  Court will be in

19  recess.

20     (Proceedings concluded at 11:30 a.m.)

21

22

23

24

25

1  <u>CERTIFICATE OF TRANSCRIBER</u>

2          I, Janice Russell, court-approved transcriber, in and

3  for the United States District Court for the Eastern District

4  of North Carolina, do hereby certify that pursuant to Section

5  753, Title 28, United States Code, that the foregoing is a true

6  and correct transcript from the official electronic sound

7  recording of the proceedings held in the above-entitled matter

8  and that the transcript page format is in conformance with the

9  regulations of the Judicial Conference of the United States.

10

11          Dated this 7th day of February, 2023.

12

13          /s/ *JANICE RUSSELL*
           JANICE RUSSELL
14          COURT-APPROVED TRANSCRIBER

15

16

17

18

19

20

21

22

23

24

25